**Dawn Nalee WINKLER, Appellant
(Petitioner below),**

v.

**Kirk Steven WINKLER, Sr., Appellee
(Respondent below).**

No. 16A05–9612–CV–528.

Supreme Court of Indiana.

Sept. 8, 1998.

Jonathan E. Palmer, Matchett Arnold & Palmer, Shelbyville, for Appellant.

Karl L. Mulvaney, Candace L. Sage, Bingham Summers Welsh & Spilman, Indianapolis, for Appellee.

## ON PETITION TO TRANSFER

Petition to transfer denied.

SULLIVAN, Justice, dissenting from the denial of appellant's petition to transfer.

This is a child custody case involving two children with hearing impairments. One child is totally deaf and the other moderately impaired. The trial court granted father's request to change custody of the children to him from mother and the Court of Appeals affirmed.

The basis for father's change of custody petition was that it was in the best interests of the children to be "mainstreamed" in the local public school rather than raised in "deaf culture" (at the Indiana School for the Deaf) as was custodial parent mother's choice. Key in the trial court's custody determination was mother's insistence that the children become fluent in American Sign Language as their first language before learning any English (including through the use of hearing aids). Indeed, mother's decision that the moderately impaired child eschew a hearing aid appears to have been central both to the trial court's decision to change custody and the Court of Appeal's decision to affirm.

I find no fault with the trial court's thorough and careful analysis of father's request. And at the end of the day I might well agree with its decision to change custody. But I respectfully dissent from the denial of transfer in this case because I believe it raises two sets of questions of statutory interpretation that warrant the attention of this court.

The first issue that I think we should grant transfer to address is what I will call the "subgroup" issue.[1] Mother contends that as the custodial parent, she is entitled to raise the children in the subgroup of deaf culture, which she describes as a "thriving, independent community of its own with many social activities, churches, social gatherings and employment opportunities, linguistic styles, stories and folk lore." According to mother, American Sign Language ("ASL") is the "native language" of deaf culture—"[a]cquiring and perfecting ASL skills should dictate the educational setting and not the emphasis to learn English skills early in childhood."

Our dissolution of marriage statute provides that the custodial parent "may determine the child's upbringing, including the child's education, health care and religious training." Ind.Code § 31–17–2–17(a) (Supp. 1997).[2] If a tenet of the deaf subgroup is to develop proficiency in ASL before beginning English, is that not the kind of an "upbringing" and "education" determination that Ind. Code § 31–17–2–17(a) entrusts to the custodial parent? And if a custodial parent's educational determinations are subject to court scrutiny, what result in challenges to a custodial parent's following subgroup dictates as to the child's health care and religious training? I would grant transfer in this case to examine when adherence to subgroup principles may jeopardize child custody.

The second issue that I think we should grant transfer to address is what I will call the "remedy" issue. While our dissolution statute entrusts the custodial parent with authority to "determine the child's upbringing," a trial court "may specifically limit" this authority upon a finding that a child's physical health would be endangered or emotional development significantly impaired. Ind. Code § 31–17–2–17(b) (Supp.1997). A separate section of the statute prohibits a court from modifying custody "unless (1) the modification is in the best interests of the child; and (2) there is a substantial change in one or more" specific factors such as the wishes of the child's parent or parents, the child's adjustment to the child's home, school and

1. I borrow this characterization from Professor Minow who uses it in a similar context. *See* Martha Minow, *The Constitution and the Subgroup Question,* 71 Ind. L.J. 1 (1995). The members of the subgroup at issue in this case are deaf; at issue in Professor Minow's article are (primarily) Jews, though her inquiry broader. She asks, "When must members of a subgroup suppress their group affiliation to enjoy the benefits accorded by the state?" *Id.* at 2. Mother here might frame the issue on appeal as whether parents of a deaf child must suppress affiliation with deaf culture and instead mainstream the child to enjoy child custody in Indiana.

2. Indiana's dissolution of marriage and related statutes were re-codified in 1997. References in this opinion are to the sections of the Indiana Code as re-codified.

community, and the mental and physical health of all individuals involved. Ind.Code §§ 31–17–2–21(a) and 31–17–2–8 (Supp.1997).

Father contends that by refusing to allow the children to develop their sense of hearing, mother has prevented her children from developing emotionally, educationally and socially. If that be so—and the trial court found that it was—is the proper remedy under our statute a specific limitation on mother's authority under Ind.Code § 31–17–2–17(b) or does it constitute grounds for the more drastic remedy of change of custody to father under Ind.Code § 31–17–2–21(a)? It appears to me that a strong argument can be made that our statute contemplates the former, less drastic, remedy when a custodial parent's upbringing decisions adversely implicate the child's physical health or emotional development. I would grant transfer to identify the point at which the court's remedial power in such circumstances moves beyond imposing a specific limitation upon the custodial parent's authority to the much more drastic remedy of a change in custody.

SHEPARD, C.J., concurs.